**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**STATESVILLE DIVISION**
**CASE NO. 5:14-CV-00137-RLV-DCK**

| | |
|---|---|
| ALVIN LINEBERGER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | )    **ORDER** |
| | ) |
| TOU-BER YANG, AND JAMIE LOWE, | ) |
| | ) |
| | ) |
| | ) |
| Defendants. | ) |
| | ) |
| | ) |

     **THIS MATTER IS BEFORE THE COURT** on Defendants' Second Motion for Summary Judgment. (Doc. 67). Having been fully briefed and considered, the Defendants' motion is now ripe for disposition. For the reasons stated below, Defendants' Second Motion for Summary Judgment (Doc. 67) is **GRANTED IN PART** and **DENIED IN PART**.


I.     **BACKGROUND**

     This case concerns an interaction between Officer Tou-Ber Yang ("Yang") and Officer Jamie Lowe ("Lowe") of the Newton Police Department and Plaintiff Alvin Lineberger. On February 7, 2013, the Maiden Police Department responded to a call for assistance regarding a domestic violence incident. (Doc. 54-3 at 3). When Maiden Police arrived, the victim identified H.P., Lineberger's twenty-five-year-old son, as the assailant and identified Lineberger's residence

as a place where police might locate H.P.[1]  *Id.*; (Doc. 57-5).   At the request of the Maiden Police Department, Yang and Lowe went to Lineberger's residence to try and locate H.P..  (Doc. 57-5).

Once at Lineberger's residence, Lowe knocked on Lineberger's front door.  (Doc. 59 at 3). Lineberger, who was in the shower when Lowe knocked, answered the door wearing only a small towel.  *Id.*; (Doc. 54-5 at 25-26).  Lineberger, forty-four years of age at the time of the interaction, informed Lowe that H.P. was not in his residence and did not live at his residence.  (Doc. 54-5 at 5, 22).  Lineberger then attempted to close the door to terminate his interaction with Yang and Lowe; however, Lowe stuck his foot across the threshold of Lineberger's front door, preventing Lineberger from closing the door.  *Id.* at 22.

According to Lineberger, Lowe refused to remove his foot from the threshold of the door unless Lineberger consented to Yang and Lowe searching his residence.  *Id.* at 22-23.  Yang then stated that he would arrest Lineberger if Lineberger did not consent to the search and that Yang and Lowe would think up a charge to support the arrest.  *Id.*  When Lineberger declined to consent to the search, Yang and Lowe demanded that Lineberger produce identification.  *Id.* at 23. Lineberger declined to comply with Yang and Lowe's demand for identification even as Yang and Lowe continued to threaten him with arrest.  *Id.*  With Lowe's foot still in the threshold of Lineberger's front door and Yang and Lowe continuing to demand identification, Lineberger told Yang and Lowe that they knew who he was and stated, allegedly in sarcasm, that he was "Jesse James."[2]  *Id.*

---

[1] It is unclear from the record whether H.P. is Lineberger's biological son or the son of his girlfriend.  (*See* Doc. 54-5 at 5).  This discrepancy, however, is not material to the disposition of Defendants' Second Motion for Summary Judgment.
[2] The Court takes judicial notice that "Jesse James" was an infamous outlaw linked to multiple bank robberies, train robberies, and murders in the mid to late 1800s.

Lineberger then called 911, informing the 911 operator that Yang and Lowe were trying to force their way into his residence. (Audio Recording 2013000214(1) at 0:06-0:15); (*see also* Doc. 54-5 at 24). Lineberger requested "assistance in terminating the encounter with [Yang and Lowe]" by asking the 911 operator to dispatch a detective or the sheriff to his residence. (Doc. 59 at 5); (Audio Recording 2013000214(1) at 0:17-0:30). When asked by the 911 operator to provide his name and address, Lineberger complied with the request. (Audio Recording 2013000214(1) at 0:23-0:38). The 911 operator initially advised Lineberger that he would dispatch an officer to Lineberger's address but then informed Lineberger that only Yang and Lowe could assist him. *Id.* at 0:40-1:12.

Apparent to Lineberger that Yang and Lowe would not depart unless he produced identification, Lineberger acceded to the request and retreated into his residence to retrieve his identification. (Doc. 54-5 at 26; Doc. 59 at 5). Yang and Lowe fully entered Lineberger's residence, allegedly to keep Lineberger in their visual line of sight, while Lineberger retrieved his identification. (Doc. 54-7 at 45-47). When Lineberger returned to the front of his residence with his identification, he found Yang and Lowe inside of his residence with their Tasers drawn. (Doc. 54-5 at 27; Doc. 59 at 5-6). Lineberger requested that Yang and Lowe leave his residence. (Doc. 54-5 at 31; Doc. 59 at 6). Yang and Lowe refused to comply with Lineberger's request, instead demanding that Lineberger hand over his identification within five seconds. (Doc. 54-5 at 26-31; Doc. 59 at 6). When Lineberger did not immediately remove his identification from his wallet, Lowe "snatched" the wallet and identification. (Doc. 54-5 at 26, 28-29). Yang and Lowe then arrested Lineberger on charges including obstruction and delay of an investigation and providing false information. (Doc. 54-5 at 26-31; Doc. 54-7 at 50-51, 54; Doc. 54-9 at 39). Lineberger was additionally charged with misuse of 911. (Doc. 54-8 at 3).

Lineberger was transported to jail wearing only the towel he had wrapped around his body when he answered Lowe's knock. (Doc. 54-5 at 29). At the jail, Lineberger's towel fell off, fully exposing Lineberger's naked body to the magistrate judge, other arrestees, and jail employees. *Id*. at 33. Lineberger remained in jail for a day until he could post bond on the aforementioned charges. *Id*. 35-36. At trial, the aforementioned charges against Lineberger were dismissed, partially because Yang and Lowe lacked a warrant. *Id*. at 37-38; (Doc. 54-8 at 57-59).

Lineberger filed a second amended complaint raising: (1) claims under 42 U.S.C. § 1983 (2012) for Fourth, Fifth, and Fourteenth Amendment violations based on Yang and Lowe's search of his residence, his arrest, and his imprisonment (Causes of Action One through Three); (2) a claim under 42 U.S.C. § 1985(3) (2012) alleging that Yang and Lowe conspired to commit the civil rights violations identified in his § 1983 claims (Cause of Action Four); and (3) state law claims for trespass by public officer, negligence, gross negligence, negligent infliction of emotional distress, intentional infliction of emotional distress, and malicious prosecution (Causes of Action Five through Ten). (Doc. 59 at 8-16). Lineberger seeks compensatory and punitive damages, as well as costs, expenses, and attorney's fees. *Id*. at 18. With respect to Yang and Lowe, this Court granted Defendants' partial motion to dismiss as to Lineberger's 42 U.S.C. § 1985(3) claim, his negligent infliction of emotional distress and intentional infliction of emotional distress claims, and the portions of his § 1983 claims alleging Fifth Amendment and standalone Fourteenth Amendment violations. (Doc. 78). Defendants move for summary judgment, arguing that (1) Lineberger's § 1983 claims are barred by the doctrine of qualified immunity; (2) they are entitled to public official immunity on Lineberger's state law claims that survived the motion to dismiss; (3) Lineberger cannot demonstrate the existence of a policy or custom for purposes of his § 1983 claims against Yang and Lowe in their official capacities; and

(4) Lineberger cannot demonstrate that Yang and Lowe's conduct rose to a level to support punitive damages.[3] (Doc. 67-1 at 7-19, 22-25).

## II.    DISCUSSION

### 1. *Standard of Review*

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (2010). In order to support or oppose a summary judgment motion, a party is required to cite to "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, . . . admissions, interrogatory answers, or other materials;" or show "that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1); *Anderson v. Liberty Lobby*, 477 U.S. 242 (1986) (applying former version of Rule 56); *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) (same). A genuine dispute exists only if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248. In conducting its analysis, the Court views the evidence in the light most favorable to the non-moving party. *Celotex Corp.*, 477 U.S. at 325.

### 2. *Qualified Immunity*

#### A.    Standard

Qualified immunity protects government officials from monetary damages in a suit brought under 42 U.S.C. § 1983, so long as their conduct does not violate any clearly established constitutional or statutory rights of which a reasonable person would have been aware. *Harlow v.*

---

[3] As Defendants filed this motion for summary judgment on the same day they filed their motion to dismiss, the motion for summary judgment contains several additional arguments rendered moot by this Court granting Defendants' motion to dismiss. (*See* Doc. 67-1 at 17-18, 20-21).

*Fitzgerald*, 457 U.S. 800, 818 (1982). In *Saucier v. Katz*, the Supreme Court identified the two inquiries governing the qualified immunity analysis: (1) "whether a constitutional right would have been violated on the facts alleged" and (2) whether, assuming a constitutional right was violated, the right was "clearly established." 533 U.S. 194, 200 (2001).

As to the second inquiry, whether an official may be held personally liable for an unconstitutional act "generally turns on the objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken." *Messerschmidt v. Millender*, 132 S. Ct. 1235, 1245 (2012) (internal quotation marks omitted). "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (internal quotation marks and brackets omitted). A case directly on point is not required, "but existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* "[I]n gray areas, where the law is unsettled or murky, qualified immunity affords protection to an officer who takes an action that is not clearly forbidden—even if the action is later deemed wrongful." *Rogers v. Pendelton*, 249 F.3d 279, 286 (4th Cir. 2001). "The deference given to the judgments of law enforcement officers acting in good faith is particularly important in cases involving law enforcement officials investigating serious crimes." *Id.* (internal quotation marks omitted). In sum, the qualified immunity doctrine protects "all but the plainly incompetent and those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

B.     *Entry into Lineberger Residence*

Basic to the rights afforded by the Fourth Amendment is the protection against unreasonable searches of an individual's home. "'At the very core' of the Fourth Amendment

'stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.'" *Kyllo v. United States*, 533 U.S. 27, 31 (2001) (quoting *Silverman v. United States*, 365 U.S. 505, 511 (1961)). Absent consent or exigent circumstances, "the entry into a home to conduct a search or make an arrest is unreasonable under the Fourth Amendment unless done pursuant to a warrant." *Steagald v. United States*, 451 U.S. 204, 211 (1981). The protection afforded to the home under the Fourth Amendment, extends to "the land immediately surrounding and associated with the home," known as the "curtilage," where "intimate activity associated with the 'sanctity of a man's home and the privacies of life'" occur. *Oliver v. United States*, 466 U.S. 170, 180 (1984) (quoting *Boyd v. United States*, 116 U.S. 616, 630 (1886)); *see also Rogers*, 249 F.3d at 287 ("[T]he curtilage is entitled to the same level of Fourth Amendment protection extended to the home, so that, as with the home, probable cause, and not reasonable suspicion, is the appropriate standard for searches of the curtilage.").

The Fourth Amendment, however, does not restrict police from, in the course of an investigation, engaging in conduct that a member of the public could lawfully engage in. *See California v. Greenwood*, 486 U.S. 35 (1988) (finding no Fourth Amendment violation where police searched the contents of garbage can that was deposited on curb under theory that public at large could have accessed the garbage can). Applying this concept, police officers, who are without a warrant, may approach a home and knock on the door in hopes of speaking with the home's occupant just like any member of the public might. *Kentucky v. King*, 563 U.S. 452, 469-70 (2011). As police are limited to the authority of a member of the public when conducting a "knock-and-talk," the occupant is under no obligation to answer the door and speak with the officers and if the occupant opts not to answer the door, "the investigation will have reached a conspicuously low point." *Id.* at 470. Furthermore, "if an occupant chooses to open the door and

speak with the officers, the occupant need not allow the officers to enter the premises and *may refuse to answer any questions at any time*." *Id.* (emphasis added). Upon the occupant instructing the officers to leave the property, the officers continued presence on the property "exceed[s] the legitimate reasons for their entry" and reasonable suspicion that a crime has been committed is insufficient to permit the officers to search the curtilage or the home. *Rogers*, 249 F.3d at 288-90 (holding that contemplated search of curtilage based on reasonable suspicion of underage drinking would have been unreasonable under Fourth Amendment where occupant, in course of "knock and talk," instructed officers to leave his property).

Turning to the first inquiry of the qualified immunity analysis and viewing the facts in the light most favorable to Lineberger, it is apparent that Yang and Lowe violated Lineberger's Fourth Amendment right to be free from unreasonable searches. Based on the belief that H.P. might be in Lineberger's residence, Yang and Lowe approached the residence and commenced a knock and talk. Lineberger answered the door, informed Yang and Lowe that H.P. neither lived at nor was in the residence, and then expressed a desire to terminate the encounter and not answer any further questions. Rather than permitting Lineberger to close his door and terminate the encounter as Lineberger had the right to do, Lowe, by placing his foot in the threshold of the door, entered Lineberger's residence, or at least the curtilage of the residence. *Cf. United States v. Jones*, 132 S. Ct. 945 (2012) (finding that trespass onto private property can serve as basis for finding illegal search). Over Lineberger's continued protest to Yang and Lowe's presence on his property, Lowe refused to remove his foot from the threshold of the door. Furthermore, Yang and Lowe's full entry into Lineberger's residence when Lineberger retrieved his identification, while arguably justified by concerns of officer safety at that juncture, was a product of Yang and Lowe continuing their interaction with Lineberger in violation of Lineberger's Fourth Amendment rights. *Cf. King*,

563 U.S. at 469-71 (distinguishing situations where police created exigency is the result of "actual or threatened violation of the Fourth Amendment" from situations where exigency is the result of lawful police conduct). Further, as nothing suggests that Lowe removed his foot from the threshold of the door and exited the residence prior to both officers fully entering the residence, Yang and Lowe's full entry into Lineberger's residence was a continuation of their presence in Lineberger's residence, rather than a separate entry. Accordingly, viewing the facts in the light most favorable to Lineberger, Lowe's placement of his foot in the threshold of the door constituted a violation of Lineberger's Fourth Amendment rights and Yang and Lowe's full entry into the residence constituted an escalation of that violation.

Turning to the second inquiry of the qualified immunity analysis, the contours of the Fourth Amendment both with respect to an officer's ability to enter a home, or the curtilage of the home, and with respect to an officer's limited authority when conducting a "knock and talk" were well defined by the United States Supreme Court and the United States Court of Appeals for the Fourth Circuit prior to Yang and Lowe arriving at Lineberger's residence. *See King*, 563 U.S. at 469-70; *Oliver*, 466 U.S. at 180; *Steagald*, 451 U.S. at 211; *see also Rogers*, 249 F.3d at 287-90.[4] Yang

---

[4] In *Rogers*, officers received a noise complaint in relation to a party and arrived at Rogers' residence with the intent of searching the curtilage of Rogers' home for evidence of the noise violation and underage drinking. When they arrived at Rogers' residence, they observed Rogers drinking alcohol in front of his house, and allegedly observed individuals who appeared under the age of twenty-one "scurrying" away. *Rogers*, 249 F.3d at 284, 286. Officers spoke with Rogers and Rogers informed them that he owned the property and that they were to leave his property. *Id.* at 284. Rather than terminate the encounter, the officers remained on the property and arrested Rogers for public drunkenness and impeding an officer. *Id.* at 284, 286. The *Rogers* Court held that the search the officers intended to perform would have violated Rogers' Fourth Amendment rights because it would have constituted a conversion of the officers' "limited license to do what any citizen may do—approach the house and speak to the inhabitant or owner—into a license to search for 'evidence' and speak to various guests at a party after speaking to Rogers and being asked to leave." *Id.* at 294. The *Rogers* Court also held that reasonable suspicion is insufficient to support an investigatory search of the curtilage because "probable cause plus either a warrant or exigent circumstances" is required." *Id.* at 288-90. Here, Yang and Lowe lawfully entered Lineberger's property, spoke with Lineberger, and then entered the curtilage of Lineberger's home in an effort to search for H.P. and/or to gather information about Lineberger's identity over Lineberger's request that Yang and Lowe leave his property. In other words, Yang and Lowe, seemingly without a warrant, performed a search akin to that which the officers in *Rogers* intended to perform and that the Fourth Circuit concluded would have been unconstitutional.

and Lowe contend that while their interaction with Lineberger commenced as a knock and talk, it turned into an investigatory detention based on reasonable suspicion or probable cause and that no binding case law holds that it is unconstitutional to conduct an investigatory detention in a home.[5] (Doc. 67-1 at 10-12). In support of this argument, Yang and Lowe assert that Lineberger's refusal to provide his name created reasonable suspicion that Lineberger was H.P.

Yang and Lowe's argument suffers from three shortcomings. As an initial matter, *Rogers* clearly established that "as with the home, probable cause, and not reasonable suspicion, is the appropriate standard for searches of the curtilage." 249 F.3d at 287. Thus, probable cause, not merely reasonable suspicion, was needed before Lowe could continue the knock and talk over Lineberger's objection and place his foot in, at least, the curtilage of Lineberger's home.

Separately, crediting Lineberger's account of the interaction, Lowe placed his boot in the threshold of Lineberger's door before Lowe asked Lineberger for his name or identification.[6] Thus, if the interaction transitioned from a "knock and talk" to an investigatory detention, the alleged basis for Yang and Lowe's reasonable suspicion in support of the investigatory detention occurred after Lowe continued the interaction over Lineberger's objection.[7] Finally, although

---

[5] Yang and Lowe cite *Moore v. Pederson*, 806 F.3d 1036 (11th Cir. 2015), for the proposition that no binding precedent exists foreclosing an officer's ability to lawfully conduct an investigatory detention based on reasonable suspicion in a home. Although *Moore* involved an interaction that commenced as a "knock and talk" and ended with Moore being arrested, within his home, for failing to provide identification, nothing in *Moore* suggests that Moore attempted to terminate the interaction or otherwise instruct the officers to leave his residence. *See* 806 F.3d at 1040-41; *see also Moore v. Seminole Cty., Fla.*, 2014 WL 4278744, at *1-2 (M.D. Fla. Aug, 29, 2014). Thus, while then-existent case law may or may not have clearly prohibited an investigatory detention within a home absent the homeowner's objection, Lineberger's claim presents the added allegation that he did object to Yang and Lowe's presence and did attempt to terminate the encounter.

[6] Defendants assert that Lineberger testified that he tried to close his door after refusing to provide his name. (Doc. 67-1 at 17). Contrary to Defendants' representation of Lineberger's deposition testimony, Lineberger clearly stated that he tried to close his door before Lowe asked for his name and identification.

[7] To the extent Yang and Lowe suggest that Lineberger providing the name "Jesse James" gave them reasonable suspicion to believe Lineberger committed the offense of providing a false name, Yang and Lowe's argument suffers from the same temporal problem in that Lowe exceeded his authority in violation of Lineberger's Fourth Amendment rights before Lineberger stated that he was "Jesse James." Furthermore, Yang and Lowe's argument is dependent on the resolution of a genuine issue of material fact—whether Lineberger said he was "Jesse James" with such sarcasm that no reasonable officer could have thought that Lineberger actually and willfully represented that he was "Jesse James." *See e.g.* N.C. Gen. Stat. § 14-225(a).

probable cause plus a warrant or an exigent circumstance satisfies the Fourth Amendment reasonableness threshold for searching the curtilage of a home, it is not apparent that Yang and Lowe had a warrant and the exigent circumstance Yang and Lowe rely on for entering Lineberger's residence arose well after Lowe placed his foot in the threshold of the door.

Even, however, putting the temporal shortcomings in Yang and Lowe's argument aside, it is not apparent, at this stage of litigation, that an officer in Yang or Lowe's position could have objectively believed that there was probable cause to conclude that Lineberger was H.P. First, Lineberger is nineteen years older than H.P., and in his deposition, Lowe testified that he received a description of H.P. before approaching Lineberger's residence. (Doc. 54-7 at 24). Second, were a jury to credit Lineberger's deposition testimony, the jury could conclude that Lowe was familiar with Lineberger and with H.P. from a prior encounter with both individuals such that a reasonable officer in Lowe's position and with a description of H.P. could not have objectively believed that Lineberger was H.P. Accordingly, even if a finding of probable cause alone was sufficient to shield Lowe from liability for his entry into the threshold of Lineberger's door, absent resolution of the aforementioned issues of material fact—whether a warrant was issued, the extent of the description of H.P. Lowe received, whether Lowe knew Lineberger or H.P., whether Lineberger and H.P. are sufficiently similar in appearance to allow a reasonable officer to mistake Lineberger for H.P.—it is not possible to conclude that a reasonable officer could have believed he had probable cause to think that Lineberger was H.P. Therefore, Lineberger's claim under § 1983 that Yang and Lowe violated his Fourth Amendment right to be free from unreasonable searches survives Yang and Lowe's assertion of qualified immunity.[8]

---

[8] Lineberger's first cause of action under § 1983 alleges that, in addition to an unreasonable search of his residence, Yang and Lowe unreasonably seized him. (Doc. 59 at 9). This allegation is apart from his claim of false arrest. (*See* Doc. 59 at 9). The parties do not explicitly brief the issue of when Yang and Lowe seized Lineberger. Implicitly, it would appear that Yang and Lowe concede that a seizure occurred when the "knock and talk" transformed into an

C.        *Arrest and Imprisonment of Lineberger*

Lineberger was arrested on charges of (1) Resisting, Delaying, or Obstructing a Public Officer, in violation of N.C. Gen. Stat. § 14-223, (2) Making a False Report to a Law Enforcement Officer, in violation of N.C. Gen. Stat. § 14-225(a), and (3) Misuse of the 911 System, in violation of N.C. Gen. Stat. § 14-111.4.[9] As a result of these charges, Lineberger spent one day in jail before posting bond. (Doc. 54-5 at 35-36). Yang and Lowe contend that they are entitled to qualified immunity on Lineberger's claims for false arrest and false imprisonment because probable cause supported the arrest or, at a minimum, an officer in their position could have reasonably believed that probable cause supported the arrest. (Doc. 67-1 at 15-17). In response, Lineberger contends that no reasonable officer could conclude that Lineberger's actions provided probable cause on any of the three charges. (Doc. 71 at 16-19).

The Fourth Amendment protects a person from unreasonable seizures and, as a general rule, a seizure in the form of an arrest is only reasonable if it is based on probable cause. *Rogers*, 249 F.3d at 290. "The long-prevailing standard of probable cause protects citizens from rash and unreasonable interferences with privacy and from unfounded charges of crime, while giving fair leeway for enforcing the law in the community's protection." *Maryland v. Pringle*, 540 U.S. 366, 370 (2003) (internal quotation marks omitted). "Probable cause is defined in terms of facts and circumstances sufficient to warrant a prudent man in believing that the suspect had committed or

---

investigatory detention. *Cf. Terry v. Ohio*, 392 U.S. 1 (1968). The same issues with Yang and Lowe's reasonable suspicion for entering the threshold of the doorway to Lineberger's residence would apply to the initial seizure of Lineberger during the alleged investigatory detention such that Lineberger may proceed with his § 1983 claim as to that seizure.

[9] There is a discrepancy in the record regarding whether Lowe, as the arresting officer, charged Lineberger with Misuse of the 911 System or whether the magistrate judge added this charge. (*See* Doc. 54-8 at 1, 3; *see also* Doc. 54-7 at 50-54; Doc. 54-9 at 39). For purposes of evaluating Yang and Lowe's qualified immunity defense, this discrepancy is immaterial because the relevant inquiry is whether a reasonable officer, presented with the facts known to Yang and Lowe at the time of the arrest, could have objectively believed that there was probable cause to arrest Lineberger for an offense. *See Devenpeck v. Alford*, 543 U.S. 146, 153-54 (2004).

was committing an offense." *Rogers*, 249 F.3d at 290 (internal quotation marks and brackets omitted). The probable cause determination

> turns on two factors in combination: the suspect's conduct as known to the officer, and the contours of the offense thought to be committed by that conduct. Probable cause therefore could be lacking in a given case, and an arrestee's right violated, either because of an arresting officer's insufficient factual knowledge, or legal misunderstanding, or both.

*Id.* (internal quotation marks omitted). Where, as here, the offenses potentially supporting Lineberger's arrest are state offenses, the Court must look to North Carolina law to determine what conduct is proscribed by each statute at issue. *Id.* at 291 ("Because the probable cause inquiry is informed by the contours of the offense at issue, we look to [state] cases to determine the reasonable scope of [the statute involved]." (internal quotation marks omitted)).

Before analyzing whether probable cause supported Lineberger's arrest, the Court acknowledges that Lineberger's arrest occurred subsequent to Yang and Lowe's continuation of their encounter with Lineberger and that but for Yang and Lowe continuing the encounter, no arrest would have occurred. While the continuation of the encounter might be sufficient to deem Lineberger's arrest improper within the context of a criminal case, the "fruit of the poisonous tree" doctrine does not apply in the civil setting and a § 1983 litigant must demonstrate that the officers' actions were both the but for and proximate cause of the constitutional violation. *Townes v. City of N.Y.*, 176 F.3d 138, 145-47, 149 (2d Cir. 1999). Accordingly, to determine if Yang and Lowe are entitled to qualified immunity on Lineberger's false arrest and false imprisonment claims, the Court must determine whether, at the time of the arrest, a reasonable officer in Yang and Lowe's position could have objectively believed that there was probable cause to arrest Lineberger on any of the aforementioned charges. *See id.* at 149 (holding that unlawful seizure and search of vehicle that plaintiff was in gave rise to cognizable § 1983 claims based on seizure and search of vehicle

but that plaintiff could not proceed with false arrest claim where search of vehicle yielded firearms and provided officers probable cause for arrest).

Finding the probable cause analysis with respect to the offense of Misuse of the 911 System dispositive on the issue of qualified immunity, the Court will proceed directly to its analysis under that statute and forego analyzing whether probable cause supported Lineberger's arrest for Resisting, Delaying, or Obstructing a Public Officer or for Making a False Report to a Law Enforcement Officer  and whether a reasonable officer could have believed there was probable cause to support those charges.  Under N.C. Gen. Stat § 14-111.4, "[i]t is unlawful for an individual who is not seeking public safety assistance . . . to access or attempt to access the 911 system for a purpose other than an emergency communication."  Enacted in 2007, N.C. Gen. Stat. § 14-111.4 is a relatively new statute that the North Carolina Court of Appeals interpreted for the first time in 2015 and that the Supreme Court of North Carolina is yet to interpret.  *See Jensen v. Jessamy*, 776 S.E.2d 364, 2015 WL 4448129 (N.C. Ct. App.), *cert. denied*, 781 S.E.2d 291 (2015) (unpublished).  Accordingly, at the time of Lineberger's arrest, an officer called on to determine whether there was probable cause of a violation of N.C. Gen. Stat. § 14-111.4 would have been guided only by the language of the statute.[10]

In considering whether an individual violated N.C. Gen. Stat. § 14-111.4, an officer would need to first determine whether there was probable cause to conclude that the individual contacted 911 for a reason other than seeking "public safety assistance."  If, and only if, the officer concluded that the individual called 911 for a reason other than seeking "public safety assistance," the officer would then consider whether the individual accessed the 911 system "for a purpose other than an

---

[10] In analyzing a qualified immunity defense, a district court may skip over the question of whether a constitutional violation occurred and proceed directly to the question of whether the constitutional right was "clearly established" at the time of the alleged violation.  *Pearson v. Callahan*, 555 U.S. 223, 237-42 (2009).

emergency communication." The nature and circumstance surrounding Lineberger's call to 911 were atypical of the reasons an individual would be justified in calling 911. The audio recording of Lineberger's 911 call clearly demonstrates that Lineberger asked the 911 dispatcher to send out a detective or the sheriff to assist him in dealing with Yang and Lowe. (Audio Recording 2013000214(1) at 0:06-0:15). However, Lineberger made his request in the context of alleging that Yang and Lowe were harassing him, that his civil rights were being violated, and that he wanted to speak with someone other than Yang and Lowe. Lineberger's complaint alleges that he "called 911 for assistance in terminating the encounter with [Yang and Lowe]." (Doc. 59 at 5). Furthermore, Lineberger's own deposition testimony establishes that he placed the 911 before Yang and Lowe fully entered his residence and before they pulled out their Tasers. (Doc. 54-5 at 27). Thus, while Lineberger sought the assistance of a public safety officer, a reasonable officer could have viewed his call to 911 as being based on something other than a threat to his health or safety or a threat of damage to his property beyond the incidental damage that accompanies a trespass by an individual known to the property owner.

Confirming the potentially ambiguous nature of the help Lineberger sought is the 911 dispatcher's decision not to send a unit to Lineberger's residence and his instruction that Lineberger needed to talk to Yang and Lowe. The conclusion that a 911 caller's mere request for police assistance does not prevent an officer from reasonably concluding that there is probable cause to believe that a caller violated N.C. Gen. Stat. § 14-111.4 is also supported by now-existent case law. *See Jensen v. Jessamy*, 776 S.E.2d 364, 2015 WL 4448129 at *4-5 (finding that reasonable officer could believe he had probable cause for warrant where 911 caller repeatedly requested police assistance regarding neighbor violating civil no-contact order but police found no evidence of violation). Accordingly, although situations may arise where a citizen unquestionably

seeks "public safety assistance" to address ongoing actions of a police officer, a reasonable officer, acting in the absence of any case law interpreting and defining the contours of N.C. Gen. Stat. § 14-111.4, could have concluded that there was probable cause to believe that Lineberger called 911 for a reason other than seeking "public safety assistance."

The preceding probable cause analysis relevant to the "public safety assistance" element has significant bearing on the probable cause analysis relevant to the "emergency communication" element. On one hand, Lineberger could be viewed as placing the call in an effort to seek protection from the ongoing efforts of Yang and Lowe to enter his residence. On the other hand, Lineberger could be viewed as placing the call to report police misconduct in an effort to discourage Yang and Lowe from continuing to demand that he produce identification and let them search his house. Thus, a reasonable officer could have objectively concluded that Lineberger was accessing the 911 system for a purpose other than an emergency communication, primarily to terminate his encounter with Yang and Lowe. The potential and theoretical reasonableness of Yang and Lowe's probable cause conclusion is further supported by the magistrate judge's post-arrest determination to hold Lineberger over on the charge of misuse of 911. *Cf. Torchinsky v. Siwinski*, 942 F.2d 257, 261-62 (4th Cir. 1991) (discussing judicial officers pre-arrest probable cause determination as part of qualified immunity analysis). Therefore, although arresting Lineberger for misusing 911 may constitute an example of very poor charging discretion in a situation where the presence of additional officers could have prevented the encounter from escalating further, it cannot be said that it would have been clear to an officer in Yang and Lowe's position that probable cause did not exist to support the charge. Accordingly, Lineberger's claims for false arrest and false imprisonment do not survive Yang and Lowe's assertion of qualified immunity.

*3. State Law Claims & Public Official Immunity*

The doctrine of public official immunity specifically applies to torts sounding in trespass, malicious prosecution, and false arrest. *Campbell v. Anderson*, 576 S.E.2d 726, 730 (N.C. Ct. App. 2003). Under North Carolina law, police officers, as public officials, are not subject to "individual liability for negligence in the performance of their governmental or discretionary duties." *Id.* Instead, individual liability only arises when the officer performs an act "with corruption or malice." *Id.* An act is performed with malice where the act is "(1) done wantonly, (2) contrary to the actor's duty, and (3) intended to be injurious to another." *Wilcox v. City of Asheville*, 730 S.E.2d 226, 230 (N.C. Ct. App. 2012) (citing *In re Grad v. Kaasa*, 321 S.E.2d 888, 890 (N.C. 1984)). In applying North Carolina's public official immunity doctrine, the United States Court of Appeals for the Fourth Circuit has held that "[a]n officer acts with malice when he 'does that which a man of reasonable intelligence would know to be contrary to his duty,' i.e., when he violates a clearly established right." *Cooper v. Sheehan*, 735 F.3d 153, 160 (4th Cir. 2013) (quoting *Bailey v. Kennedy*, 349 F.3d 731, 742 (4th Cir. 2003)). In this respect, the analysis underlying public officer immunity mirrors the qualified immunity analysis. *See id.*; *see also Bailey*, 349 F.3d at 742 (holding that denial of qualified immunity defense within context of alleged Fourth Amendment violation acts as basis for denying public officer immunity).

Applying this understanding of the public officer immunity doctrine, the portion of Lineberger's state claim for trespass by public officer related to Yang and Lowe's search of his residence survives Yang and Lowe's assertion of public officer immunity.[11] Meanwhile, Yang and Lowe are entitled to summary judgment on Lineberger's claims for negligence, gross negligence, and malicious prosecution because those claims only raise allegations with respect to

---

[11] Lineberger's assertion that Yang and Lowe threatened to make up a charge and take him to jail if he did not let them search his home also supports a jury's ability to find malice. (*See* Doc. 54-5 at 22-23; Doc. 59 at 16-21).

Lineberger's arrest, which this Court determined Yang and Lowe could have believed was supported by probable cause. Yang and Lowe are also entitled to summary judgment on the portion of Lineberger's claim for trespass by public officer related to his arrest and imprisonment.

### 4. Official Capacity Claims

In addition to his claims against Yang and Lowe in their individual capacities, Lineberger brings claims against Yang and Lowe in their official capacities on the theory that the Newton Police Department adopted a custom or policy permitting unconstitutional entries into residences and unauthorized demands for identification, including by failing to provide adequate training regarding how to conduct a "knock and talk." (Doc. 59 at 7-8). Defendants contend that Lineberger fails to proffer sufficient evidence to proceed with his policy-based claim. Doc. 67-1 at 22-24).

For purposes of § 1983, suits against governmental officials in their official capacities are "treated as suits against the municipality." *Santos v. Frederick Cty. Bd. of Comm'rs*, 725 F.3d 451, 469 (4th Cir. 2013) (internal quotation marks and brackets omitted). A municipality is not liable for the acts of its employees through a theory of respondeat superior. *Id.* at 470. Instead, a municipality only faces liability "when its 'policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the [plaintiff's] injury.'" *Id.* (quoting *Monell v. Dep't of Social Servs. Of the City of N.Y.*, 436 U.S. 658, 694 (1978). Liability can attach to the municipality for a policy or custom in any of the following four ways:

> (1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that "manifest [s] deliberate indifference to the rights of citizens"; or (4) through a practice that is so "persistent and widespread" as to constitute a "custom or usage with the force of law."

*Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003) (quoting *Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999)).  Where a plaintiff relies on a failure to train theory to establish a policy, the standard of deliberate indifference is only met where "it can be shown that policymakers were aware of, and acquiesced in, a pattern of constitutional violations." *Id.* at 474.  Similarly, where a plaintiff relies on the existence of a "custom or usage" to demonstrate a policy, the plaintiff must demonstrate that "a pattern of comparable practices has become actually or constructively known to responsible policymakers." *Spell v. McDaniel*, 824 F.2d 1380, 1391 (4th Cir. 1987).  Finally, when trying to impose liability on a municipality based on the existence of a policy, the plaintiff must demonstrate that the policy actually caused the constitutional violation in the case at hand. *See City of Canton, Ohio v. Harris*, 489 U.S. 378, 391 (1989).

Lineberger relies on the affidavit of Timothy W. Hayes, who was a Support Services Captain in February of 2013 and is the current Deputy Chief of Police for the Newton Police Department, to establish the existence of policies permitting unreasonable entries into homes and unlawful requests for identification.  (Doc. 71 at 24); (*see also* Doc. 54-2 at 1).  In his affidavit, Hayes attests that Yang and Lowe's actions "did not constitute wrongdoing."  (Doc. 54-2).  Lineberger contends that Hayes' ratification of Yang and Lowe's unlawful conduct constitutes a policy.  (Doc. 71 at 24).  Assuming that Hayes is a policymaker, Lineberger is unable to rely on Hayes' affidavit to establish the existence of a policy at the time of the interaction because Hayes' provided the affidavit more than three years after the interaction occurred.  (*See* Doc. 54-2 at 5).  Thus, even if Hayes' affidavit and ratification of Yang and Lowe's actions created a policy, the policy was created well after the interaction at issue and could not have caused the alleged violation.  Furthermore, Hayes' approval of Yang and Lowe's conduct, while potentially erroneous with respect to their entry into Lineberger's residence, constitutes the approval of a single incident

and nothing in the affidavit suggests a pattern of other unconstitutional entries into residences by officers of the Newton Police Department.

Lineberger also relies on the depositions of Yang and Lowe to assert that the Newton Police Department provided inadequate training for its officers and that officers of the Newton Police Department "engaged in widespread practices of constitutional violations." (Doc. 71 at 25). Regarding the customs of officers of the Newton Police Department when requesting identification, Lowe stated that in most situations people do not need to provide identification but that an officer may ask for identification at any time. (Doc. 54-7 at 39, 42). Lowe also stated that the majority of instances involving requests for identification surround vehicle stops but that officers also "ask" for identification when executing warrants. *Id.* at 41. Finally, Lowe stated that in a "couple" of instances he has seen officers require the production of identification when performing an investigatory stop. *Id.* at 39-40. Yang stated that it was common for officers to ask for identification when executing a warrant; however, Yang was not asked and did not indicate whether or not he had observed other officers require the production of identification in like situations. (*See* Doc. 54-9 at 33-34).

Lineberger focuses exclusively on Lowe's statement about seeing a couple of officers require identification when performing an investigatory stop. In so doing, Lineberger fails to appreciate the statement within the context of Lowe's other responses, responses that represent an accurate statement of the law. *See In re D.B.*, 714 S.E.2d 522, 526 (N.C. Ct. App. 2011) (noting that, although North Carolina has not enacted a statute requiring an individual to produce identification, officers may still ask for identification). Yang's sole response about being able to ask for identification when serving a warrant is also consistent with North Carolina law on the production of identification. *See id*. Totally apart from the contextual issues that Lineberger's

position suffers from, reading Lowe's statement about observing officers demand identification in a couple of instances in isolation would not provide a sufficient basis to find a policy, by way of custom, because a "couple" of instances does not amount to a pattern of constitutional violations that would place policymakers on notice.

Regarding Defendants' statements about training and voluntary encounters with citizens, Yang initially stated that he did not receive training on the matter but that "common sense" dictated that an individual could terminate a voluntary encounter. (Doc. 54-9 at 18). Upon further questioning, which clarified the initial question, Yang stated that the Newton Police Department did provide training regarding a citizen's ability to terminate a voluntary encounter. *Id.* at 19. Yang also stated that he received training about home entries and that an entry was only permissible based on consent or probable cause. *Id.* at 17. Lowe indicated that he received training on recent United States Supreme Court and North Carolina Supreme Court cases but that he had not received training specifically about whether he could place his foot in the door of residence in an effort to continue an interaction with a citizen. (Doc. 54-9 at 16-17, 34).

Contrary to Lineberger's contention, Yang and Lowe's testimony demonstrates that the Newton Police Department was not deliberatively indifferent when providing training regarding when an officer may enter a home. The fact that Lowe failed to comprehend that placing a foot in the threshold of a door is an entry and that Yang and Lowe arguably failed to follow their training that entry into a home is only permissible based on consent or probable cause, does not permit for the finding that there mistaken application of their training is imputable to the municipality. *See Harris*, 489 U.S. at 390-91 (holding that failure to train claim not viable based on an officer's shortcomings with the training material or where "injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-

causing conduct"). Accordingly, Lineberger has not proffered sufficient evidence of a policy to impute liability on the municipality for Yang and Lowe's actions and Defendants' Second Motion for Summary Judgment is granted with respect to all claims against Yang and Lowe in their official capacities.

*5. Punitive Damages*

Within the context of a § 1983 action, punitive damages are available "for conduct that involves 'reckless or callous indifference to the federally protected rights of others,' as well as for conduct motivated by evil intent." *Cooper v. Dyke*, 814 F.2d 941, 948 (4th Cir. 1987) (quoting *Smith v. Wade*, 461 U.S. 30, 56 (1983)). This standard for permitting punitive damages is equivalent to the standard for finding liability and awarding compensatory damages within the context of a constitutional violation. *Id.*; *see also Smith*, 461 U.S. at 51 (allowing claim for punitive damages in context of Eighth Amendment deliberate indifference claim); *Morris v. Edmonds*, 2008 WL 2891014, at *9 (E.D.N.C. July 25, 2008) (order adopting M&R and allowing claim for punitive damages to proceed in context of alleged Fourth Amendment violation). Accordingly, Lineberger's claim for punitive damages on his § 1983 claim based on Yang and Lowe's entry into his home and their initial investigatory detention of him survives Defendants' Second Motion for Summary Judgment.

Turning next to the availability of punitive damages on the portion of Lineberger's state law claim for trespass by public officer that survives summary judgment, North Carolina law permits punitive damages where the defendants' wrongful action resulting in injury to the plaintiff was accompanied by fraud, malice, or willful or wanton conduct. N.C. Gen. Stat. § 1D-15. As previously noted, an act is performed with malice where the act is "(1) done wantonly, (2) contrary to the actor's duty, and (3) intended to be injurious to another." *Wilcox*, 730 S.E.2d at 289.

Furthermore, the standard for malice is met by showing that a public officer violates a clearly established constitutional right. *Cooper*, 735 F.3d at 160. Finally, Lineberger's assertion that Yang and Lowe threatened to make up a charge and take him to jail if he did not consent to them searching the home provides sufficient basis to conclude that, beyond merely violating a clearly established right, Yang and Lowe acted wantonly and with an intent to injure if he did not succumb to their request for consent. (*See* Doc. 54-5 at 22-23; Doc. 59 at 16-21). Accordingly, Lineberger's claim for punitive damages on the surviving portion of his trespass by public officer claim survives Defendants' Second Motion for Summary Judgment.

## III. DECRETAL

**IT IS, THEREFORE, ORDERED THAT**

(1) Defendants' Second Motion for Summary Judgment (Doc. 67) is **GRANTED IN PART** and **DENIED IN PART**.

Signed: October 11, 2016

Richard L. Voorhees
United States District Judge